·Court of Appeal, Parish of Orleans.)

EXCHANGE BANK vs. E. B. WILLIAMS & CO. et als.

Issues of fact only are involved herein.

Appeal from Civil District Court, Division "C."

Rice & Montgomery, for Plaintiff and Appellee.

Pierson & Pierson, for Defendant and Appellant.

DUFOUR, J. In order that the issues presented may be properly understood, it is advisable to make a short statement of the lengthy pleadings in this case.

The plaintiff, a corporation domiciled at Friars Point, Miss., alleges that the defendants' company, a local firm, are indebted to them in the sum of $1436.90/100 with interest for the following reasons:

That on Februray 19th, 1902, for value received, defendants assigned to plaintiffs all their claims to certain lumber purchased by defendants from H. C. Buck, Jr., & Co., in consideration of the sum of $2249,35/100, being $2500 less certain agreed deductions, which was paid by plaintiff.

That on the same day, for value received, defendants assigned to plaintiffs all their rights, title and interest in and to all the cypress timber on a certain tract of land, with privileges and rights of way, known as the "Faison Brake" purchased by Buck & Co., from Faison and by the former transferred to the defendants on November 1st, 1901.

That, in consideration of this assignment, plaintiff delivered to defendants a promisory note held by it, dated November 5th, 1901, and drawn by Williams and Co., to the order of H. C. Buck, Jr., or bearer for the sum of $2000.00, on which $563.05 had been paid, leaving a balance due thereon of $1436.95.

That, on or about July 30th, 1902, when petitioner attempted to move the timber out of the brake, they were prevented by an attachment levied against Buck & Co., by one of their

creditors on Jany. 1st, 1902, and ascertained that Williams & Co., had not recorded their deed until January 17th, 1902, that the timber was subsequently sold under the attachment, and hence there was no consideration for the note because defendants through their own fault found themselves unable to deliver the timber.

The answer admits the execution of the assignment, but avers that they constituted a single transaction that, to the knowledge of the bank, the cypress timber was transferred as collateral security against loss on the issuance of said note, and that Buck & Co., failed to comply with their contract.

That defendants negotiated the sale of said lumber to Crandall & Richardson in Chicago, which would have resulted in a profit of $632.72 had not Buck & Co. wrongfully prevented them from getting car facilities for the transportation of the same, and that said Bank improperly and for its own purposes influenced defendants to make the transfers.

That the real purpose of the assignments to the Bank was to effect a settlement with Buck & Co., for whom the Bank was acting and that the real consideration for said transfers was the lumber and defendants contract with Buck, and that the timber was assigned as part therof as collateral to the same, and no separate consideration was given therefor.

The record is most voluminous and contains much correspondence and a mass of testimony, more or less relevant, from which we shall take only the salient facts and such as are pertinent to the decision of the cause.

H. C. Buck, Jr., doing business under the name of H. C. Buck, Jr., & Co., was in September, 1901, operating a saw mill at Boyle, Miss., which he had purchased from the Exchange Bank, of Friars Point, but for which he had not paid.

On September 28th, 1901, Buck entered into a·written contract with Williams & Co., to deliver them in specified grades and dimensions five hundred thousand feet of cypress lumber, half by December 1st, 1901, and half by February 1st, 1902.

The contract contained a provision that "Buck & Co. will furnish satisfactory guarantee as to clear title to cypress stumpage purchased and a satisfactory showing as to the quality and amount of the said cypress stumpage."

Williams & Co. also agreed to issue "their four months note

244

for $2000 against which Buck & Co. agree to furnish bill of sale in proper form of a certain lot of cypress timber estimated by them at 1,500,000 feet merchantable timber. Buck & Co. agree that on the purchase price of said lumber there shall be four dollars per M. deducted from the price to be paid by Williams & Co. for the above lumber which will be applied on the above $2000 note."

On October 5th, Lamkin, cashier of the Bank, at Buck's request wrote to defendants that from information received he believed the brake was well worth the price which Buck was to pay with the money to be furnished by Williams & Co.

On October 7th the defendants wrote to Lamkin as follows:

"We have a contract with Mr. Buck and it was understood that you, as cashier, were to guarantee to us that there were no incumbrances on the cypress brake in question, and that there was at a least one and one-half million feet merchantable standing timber on same, all accessible to the mill at which Mr. Buck proposes to saw it up into lumber."

To which Lamkin replied: "The information was collected by me and given to you as received by me and is, I believe correct. *But I do not undertake to guarantee anything or to assume any responsibility whatever in the matter.*"

Some time elapsed before the transaction was consummated, owing to errors and imperfections in the papers forwarded between the parties, but the note was signed on November 5th.

Complete refutation of defendants claim that they acted on the Bank's assurances is to be found ni the following letter to Buck:

"We have asked our Mr. Simpson to look into the matter of timber and, though he claims there is much less timber than you represented, at the same time he is satisfied there will be sufficient to get our contract of 500 M. feet."

The Exchange Bank discounted the note in question and placed the proceeds to the credit of Buck & Co. who checked out the amount. At the same time the note was surrendered to defendants by the Bank there had been payments on account thereof to the extent of $563.05.

About the middle of January, 1902, Buck's affairs appear to have become embarrassed to such an extent that Lamkin to

245

p ·tect the Bank's interests, made a trip to Boyle to investigate matters.

In a letter of January 18th, to defendants he says:

"I have been at Boyle for several days at mill of Buck, Jr., & Co., and find matters in very bad shape. We are interested to a considerable extent down there and Buck is heavily involved with local parties. I have been endeavoring to hold matters in check and have time to adjust his affairs without resort to litigation. We wish to get everything there under our own control and save what we can. I wish to make you this proposition :·

"*We will refund you the amount advanced to Mr. Buck on cypress and the amount you have paid on the* $2000 *note and let you out without loss.* You to *assign* to us bill of sale on Shaw brake, and *make* bill of sale to us for the cypress lumber you have advanced on at Boyle, and *assign* lease to ground on which it is piled, in case you have lease. Your refusal to accept this proposition will leave the matter in this shape: A large amount of logs which have been sawed into cypress have not been paid for, and these parties will cause you trouble if not settled with. *We will force collection of balance due on the* $2,000 *note of yours that we hold* and you will be involved in expensive and vexatious litigation. Mr. Buck cannot operate the mill under present conditions; and *unless you are willing to take what you have put in there and get out we cannot control situation* and he (Buck) will be forced into· bankruptcy. Wire us whether or not you will be willing to do this. *If you accept, draw* on us for *advance made on cypress and what you have paid on* $2000 *note* with papers referred to and have attached an inventory of cypress lumber as per your inspector's reports."

It is immaterial to inquire whether there was a single transaction or two distinct ones.

It is clear that the purpose of the agreement resulting from the acceptance of the foregoing proposition was, on the one hand, to allow the plaintiff for its own protection, to control the situation in reference to Buck's affairs, and, on the other, to allow the defendants to withdraw from their engagements without loss to themselves.

The Bank kept faith and carried out its obligations to the letter, it paid the sum agreed upon, returned the note in question

and obtained from Crandall & Richardson a release from their contract with Williams. To bring about that result, it surrendered to Crandall & Richardson some of its own oak timber, over and above the timber included in the original contract with Williams & Co.

The latter's claim that they have not been made whole, as they lost their profits on the Crandall & Richardson contract is an evident after-thought, apparently provoked by the exigencies of this suit, Buck's default, if not remedied by the Bank, would have made it impossible for them to comply with their obligations, and they admit that "while we are losing the profits, we are satisfied to be relieved of any damage claim on the part of Crandall & Richardson for non-delivery according to the contract."

The fundamental error of defendants' theory is the unwarranted assumption that the Bank was, in any manner and at any time, acting for Buck; it acted for itself, in the protection of its own interest and it was an absolute stranger to the contract between Buck and Williams & Co. The charge is groundless that the Bank assisted or instigated Buck in his actions or had anything to do with causing the refusal of car facilities.

The sole cause of the injury herein is found in the failure of defendants to seasonably record the deed to the brake and timber and in thus allowing a subsequent creditor of Buck to secure a priority thereon by attachment, under the law of Mississippi.

It was their plain duty, under their agreement, to turn over to the Bank the security in the same unimpaired and unincumbered condition as when they received it from Buck.

Had they done so, no injury would have occurred.

Although defendants have come out without loss, so far as plaintiffs' conduct is concerned, their negligence, in the discharge of their contractual obligation has entailed a loss on the latter which they must repair.

There is no force in the contention that plaintiff should have made an effort to minimize the loss by buying out or paying off the attaching creditor, when it appears, that defendants, with full knowledge of al lthe circumstances declined to take steps in the like direction.

The defences urged are not in accord with the judicial con-

ception of fair dealing and cannot be sustained.

Judgment affirmed.

November 5. 1906.

## ON REHEARING.

A executed and allowed to B his accommodation note for the use of the latter and in order to protect A from loss in the event the latter should have to pay the note, B executed to A a deed, in the form of a sale, of certain property, the deed reciting, however, the fact that it was intended by the parties only as security for the purpose stated. B discounted the note in a Bank which was fully aware of all the facts connected with the transaction. Subsequently B became involved in debt, and the Bank, being its largest creditor, sought to get control of B's business so as to enable it to save what it could on B's indebtedness to it, and to that end proposed to A, who was in business relations with B, that if A would "get out," it, the Bank, would "let him out without a loss," if A would accept from the Bank all the money he had advanced to B in the business—which was the lumber business—and the return to him of his accommodation note which he had loaned to B and which the Bank held, if A, on his part, would assign to the Bank the deed aforesaid and a certain lease of land on which lumber was stored, and make to the Bank a sale of the lumber thereon. This proposition was accepted by A and was duly carried out by both parties. The accommodation note was cancelled and returned to A, and he was refunded what he had advanced to B; the deed securing A against loss in the event he had to pay the note was assigend to the Bank and the other engagement of A fulfilled. The deed guaranteeing A against loss on the note was not recorded and the creditors of B seized the property covered by the deed, sold it and applied the proceeds of sale to their judgment. Thereupon the Bank sued A for the amount which was due on the accommodation note given to B at the time it was surrendered by the Bank to A, basing its demand on the ground that had the deed from B to A been seasonably recorded the property covered thereby could not have been seized and sold and that if it had been the

Bank would have been preferred out of the proceeds of sale to the amount due on the note.

Held; that as the deed was one of security not of sale, and was intended and declared to be solely for the purpose of protecting and guaranteeing A against loss in the event he should have to pay the note, it was personal to A and gave him no right which was transmissable to a third person and which could serve as a security for the debts due by B to that other person; that the security become ineffectual the moment the obligation it was intended to secure no longer existed and that, hence, registry of the act could not have benefited the Bank and consequently its non-registry could not have injured it; that when the Bank surrendered the note to A, the maker, all rights which he had under the deed fell, it could no longer serve as security to A for the note which was surrendered to him nor for any other of B's obligation to him and still less for any debt of B to the Bank or to any one else whether the deed was recorded or not, and assuredly not to the Bank for a note which it had surrendered to the maker for value and where it is not pretended that the note was obtained by fraud, deceit or misrepresentation on the part of the maker.

Former opinion and decree recalled and judgment appealed from reversed.

DUFOUR, J., dissents for the reasons assigned in the former opinion.

MOORE, J. A re-examination of this cause has satisfied us of the error of our former conclusion.

The salient facts of the case are that Buck & Co., who were were operating a saw mill at Boyle in the State of Mississippi became heavily involved in debt, their principal creditor being the plaintiff Bank. The affairs of the firm had reached such a crisis in January, 1902, that the Bank realized that unless it could hold matters in check so as to avert litigation and stay forced bankruptcy proceedings, and then "get every thing there under our (its) control and save what we (it) can," as it avowed in its letter to Williams & Co., there was little hope of saving its claim.

At this time Williams & Co. was under contract with Buck & Co. to take from the latter 500,000 feet of cypress lumber

249

which the latter firm was to furnish from its mill, in the grades at the time and for the price stipulated in the contract. Williams & Co. agreed to and did issue their four months note for $2000.00 to Buck & Co. in order to aid the latter firm in the manufacture and delivery of the 500,000 feet of lumber above stated. There was no other consideration for this note. It was simply a loan by Williams & Co. to Buck & Co. to enable the latter, by negotiating it, to raise funds to carry out their contract. As a guarantee, or securiy to Williams & Co., and in order to protect them against the payment of the note in case the same should be held by a third person Buck & Co. made a deed of sale to Williams & Co. of what is known as Shaw's Brake, sometimes called Fiason Brake. In the deed it is stipulated that the sale is in reality but a security for the note and that upon the payment or discharge of the makers of the note the sale is to fall. This note was at once discounted by Buck & Co. with the plaintiff Bank, and the proceeds placed to their credit. The record is conclusive that the Bank was thoroughly familiar with the entire transaction. It was fully advised of the nature and character of the transaction for the delivery of the 500,000 feet of lumber; it knew the facts and circumstances connected with the loan of Williams & Co's. note; the fact that the sale was the collateral or security for the note, and that the note was to be credited with the payments at 4.00 per thousand on the lumber. It was apparently as familiar with the relations existing between Williams & Co. and Buck & Co. as were the latter firm and was fully advised as to the status of the contract or contracts existing between these parties when on the 18th January, 1902, the Bank made the following within proposition to Williams & Co.:

"...... We will refun you the amount advanced to Mr. Buck on cypress, and the amount you have paid on the $2000.00 note and let you out without a loss, you to assign to us bill of sale of Shaw's brake and make bill of sale to us of cypress lumber you have advanced on at Boyle, and assign lease of ground on which it is piled, in case you have lease."

As a reason why Williams & Co. should accept this proposition, if not as a threat why they must, the Bank writes them: "Your refusal to accept this proposition will leave the matter in this shape: A large amount of logs which have been sawed

250

have not been paid for and these parties will cause you trouble if not settled with. We will force collection of balance due on $2000 note of yours that we hold and you will be involved in expensive and vexatious litigation. Mr. Buck cannot operate the mill under present conditions; and unless you are willing to take what you have put in ther and get out, we cannot control the situation and he (Buck) will be forced into bankruptcy."

At the time his proposition was made, Williams & Co. were under contract with Crandall & Richardson of Chicago to deliver them this lumber and could not accept until they ascertained whether or not Crandall & Richardson would release them from their contract. It appears also that notwithstanding that Williams & Co's. contract with Crandall & Richardson would have realibed them $3,023.93 had they been able to carry it out, it was adjusted with the Bank at $2,249.34 and on this basis, Crandall & Richardson consenting to the release, and they were finally, to use the expression of E. B. Williams, who testified in the cause, "forced to accept the proposition."

Thus it will be seen that Williams & Co. had three things to do under the agreement proposed by the Bank arnd accepted by them: First, to assign the bill of sale which they held to Shaw's Brake, and which deed, on its face stated that it was given as a collateral security against loss on Williams & Co's. $2000.00 and about which the Bank was otherwise advised, and which note was then held by the Bank; second, to make bill of sale to the lumber which had been delivered to and paid for by them under the contract existing between them and Buck & Co. and which lumber was piled on land leased to Buck & Co. at Boyle; and third, to assign the lease to the ground on which the lumber was piled.

There is no dispute that Williams & Co. fully complied with their agreement. The bill of sale to the Shaw Brake was transferred to the Bank, so also was the lease of the ground on which the lumber was piled and a bill of sale was made to the Bank of the lumber. On the other hand the Bank refunded to Williams & Co. the amount advanced by them to Buck & Co. on the cypress, adjusted the Crandall & Richardson transaction at the figures stated and returned to Williams & Co. the $2000 note; and in this way let the defendants "out without a

251

loss" and at the same time, so far as interference by Williams & Co. was concerned, put the Bank in a position to inaugurate any measures it saw fit to carry out its expressed "wish to get everything there (at the mill) under our control and save what we (it) can."

How and when and by what means the Bank proposed "to get everything there under (its) control and save what it can," no information was vouchsafed and, therefore, no obligation was incurred by Williams & Co. to aid them in accomplishing this end. Whether all the other creditors were to be consulted and their co-operation solicited; whether they were to be settled with and gotten out of the way; whether they were to be told as Williams & Co. were told by the Bank, "unless you are willing to take what you have put in there and get out, we cannot control the situation," or whether the Bank was to "control the situation" and "get everything there under (its) control," whether the other creditors were willing or not, Williams & Co. were not advised. They were simply required to accept the return of their note and the moneys advanced and assign to the Bank the collateral security which was in the form of a sale, and the lease of the land, all of which they did.

It subsequently transpired that the deed of sale was not recorded and that Shaw's Brake was attached by a creditor of Buck & Co. and sold, and bought in by a third person, the proceeds of sale being applied to the debt of the attaching creditor. It is here that plaintiff complains and asserts that if the deed to the Shaw Brake had been duly recorded the property could not have been seized under attachment; would not have been sold thereunder and that hence Shaw's Brake would have belonged to the Bank under that recorded deed or, at least, would have been a security for the Bank's debt. On the original hearing we were impressed with the plausibility of the argument submitted in support of this position and affirmed the contention in this language:

"The sole cause of the injury herein is found in the failure of defendants to seasonably record the deed to the Brake and timber and in thus allowing a subsequent creditor of Buck to secure a priority thereon by attachment under the law of Mississippi.

It was their plain duty under their agreement to turn over to

252

the Bank the security in the same unimpaired and unincumbered condition as when they received it from Buck. Had they done so, no injury would have incurred." It must be remembered that we are dealing here with a deed which, though in the form of a sale, was in truth but a motgage or security given to secure Williams & Co. against any loss which they may sustain by being made to pay their $2000 accommodation note to Buck & Co.: that the bill or deed of sale on its face clearly sets forth this fact and that the Bank had full knowledge of the nature of Williams & Co's. title under that deed and that it at all times knew that defendants were holding the deed of sale only as collateral security against loss on their note of $2000.00 loaned to Buck & Co., and which the Bank held.

Bearing these facts in mind the inquiry is pertinent, "How is it possible that the non-registry of such a deed, the principal obligation which it is intended to secure having been cancelled, could have injured any one, or have deprived them of any right which they might have enjoyed if the deed had been duly recorded? If the deed had been duly recorded the day it was executed and was extant on the records to the day the property was attached, would, under the fact that there no longer existed the primary obligation which the deed was intended to secure it have availed the Bank or prevented the seizure of the property by mesne or other process? Assuredly nct? Williams & Co. was not vested with ownership in the property under the terms of that deed. "The conveyance of property in the form of a sale does not vest the ownership in the apparent buyer if the deed was really intended by both parties to be a mortgage" or any other character of security. 38 A. 154; 50 A. 1121-1125; 12 A. 529; 31 A. 348; 33 A. 261; 40 A. 307; 16 A. 12. Williams & Co., therefore, could not assign to the Bank any greater rights than they, themselves, possessed. Besides this, assigning the deed, if it were a deed of sale, would not have conveyed the property to the Bank, even if the argreement of the 18th January, 1902, was that Williams & Co. was to *convey* Shaw's Brake to the Bank, *which the agreement was not, nor is it pretended that it was.*

If the deed was, as it is in fact and as it so stipulates, a mere security to guarantee some other obligation, then the registry

of the deed would not and could not, legally have prevented a seizure by attachment or other process, of the property. "It is now well settled that property held in pledge may be seized from the pledgee's possession by another creditor of the pledgor, and that the pledgee cannot, by injunction arrest such seizure." Horner vs. Dennis 34 A. 389.

Then again, if the deed evidenced but a pledge or a mortgage or any other character of security the very instant the debt for which the security is given is discharged the security falls. The "debt" for which the security given in the instant cause was the note of $2000, issued by Williams & Co.; this note came into possession of the plaintiff Bank with knowledge that the deed of Buck & Co. was given as security against any loss on the note by Williams & Co.; this note was returned to Williams & Co. by the Bank and the deed which evidenced the security was as requested by the Bank, assigned to it. From the moment the note was returned to Williams & Co. the security held by them fell and knowledge of this result, as a matter of law, the Bank may not plead ignorance of.

It was the Bank's own proposition that was accepted by Williams & Co. There was no deception or misrepresentatons on the part of the latter which might have superinduced the transaction, nor was there anything said, or any intimation given by the Bank to them that the Bank wished to hold the deed either as a muniment of title to Shaw's Brake or as a security for its debt. They had every reason to assume, if they were called on to assume at all, that the Bank knew, as a matter of law, that a security falls with the discharge of the obligation it is intended to protect. Having had their note returned to them by the Bank, Williams & Co. had no longer any rights whatsoever under the deed to Shaw's Brake and hence could not transfer, and, so far as the record shows, never intended to transfer, any right thereunder. If the Bank assumed, as a matter of law, that an assignment of that deed to it served the purpose of securing any or all indebtedness of Buck & Co. to it, the Bank, it must suffer the consequences of its own folly, if the deed does not serve that purpose.

When we said in our former opinion "It was their (Willams & Co's.) plain duty under their agreement to turn over to the Bank the security in the same condition as when they re-

ceived it from the Bank," we erred, in the present opinion of the Court, forasmuch as it would have been impossible "to have turned over to the Bank the security in the same unimpaired and unincumbered condition as when they received it from Buck" without turning over to the Bank the $2000 note; for *without that note being held by some third person, the security under the deed would be worthless,* and even then it would have been good and valid to *Williams & Co. alone,* and then *only* when they had paid the note, for *the surety was personal to them and given solely for the purpose of protecting them against being compelled to pay the note.* In no event, therefore, recorded or unrecorded, could it have benefited third persons. So, therefore, we erred again, when we said: "Had they done so (recorded the deed) no injury would have occurred." Registry under no possible view of the case could have protected the Bank. That the registry of the deed might have *deterred* creditors who did not know the real facts from seizing the property, may doubtless be true, but no one pretends that Williams & Co. are to be held responsble for this reason.

It is sufficient defense for them to show the truth, *id est* that the registry of the deed, seasonably, could not, under its very terms and the facts as developed by the record and above stated, have availed the Bank or safeguarded in any way the latter's rights.

As the registry of the deed could not have protected the Bank so, therefore, its non-registry has not injured them, and as the sole cause assigned for the loss alleged, is the non-registry of the deed, the plaintiff cannot recover.

It is, therefore, ordered, adjudged and decreed that our former opinion and decree herein be and the same are hereby recalled, set aside and annulled, and it is further ordered, adjudged and decreed that the Judgment appealed from be and the same is hereby set aside, avoided and reversed and accordingly the petition of the plaintiff is dismissed and its demand rejected. Plaintiff and appellee to be taxed the costs of appeal as well as those of the lower Court.

March 25th, 1907.

Rehearing refused April 8, 1907.

Writ granted by Supreme Court May 7, 1907.